**Francis D. O'NEIL, Jr., and Robert A. Kimmons, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**EPIC POWER SERVICES, INC., and A, B, C, D, E, F, G, H, I, J, K, L and M, Defendants.**

Civ. A. No. 285–052.

United States District Court, S.D. Georgia, Brunswick Division.

Sept. 23, 1985.

John H. Calhoun, Vidalia, Ga., for plaintiffs.

Charles M. Kidd, David N. Schaeffer, Atlanta, Ga., R. Peter Catlin, III, Brunswick, Ga., for defendants.

## ORDER

ALAIMO, Chief Judge.

Francis D. O'Neil, Jr., and Robert A. Kimmons filed this action against their former employer, Epic Power Services ("Epic"), seeking damages for breach of contract, restraint of trade and fraud. Defendant has moved for summary judgment on the grounds that plaintiffs failed to exhaust the contractual grievance procedures mandated under the collective-bargaining agreement to which they were bound. Having read and considered defendant's brief in support of its position, the Court is of the opinion that the motion should be granted.

**FACTUAL BACKGROUND**

In October 1984, Georgia Power Company contracted with Epic to perform electrical work at the Edwin I. Hatch Nuclear Plant in Baxley, Georgia. Affidavit of Ronald T. Criddle, at 2 (May 9, 1985). Epic, in turn, hired a number of electricians, including plaintiffs O'Neil and Kimmons, to work on the job. *Id.* Local No. 508 of the International Brotherhood of Electrical Workers ("IBEW") had jurisdiction over portions of the Hatch Plant and, as a result, Epic employees were required either to be IBEW members or to obtain temporary work permits from Local No. 508. Criddle Affidavit, at 3. In addition, Epic gave as many as 16 electricians individual letters of employment, promising them wages of $17.50 per hour plus certain per

diem payments and guaranteeing them a minimum of eight to ten full weeks of work. Plaintiffs' Complaint, Exhibit A.

When Epic employees signed union authorization cards or obtained work permits on October 15–16, 1984, union officials informed them that they would be working under a collective-bargaining agreement between Local No. 508 and the Georgia chapter of the National Electrical Contractors Association ("NECA"). Criddle Affidavit, at 3–4. This agreement recognized Local No. 508 as the exclusive bargaining representative for wages, hours, and terms and conditions of employment. Inside Working Agreement Between IBEW Local No. 508 & NECA (Georgia Chapter), § 2.05 (1983). It also provided a three-step grievance procedure for resolving disputes arising under the contract. Inside Working Agreement, §§ 1.04–1.08.

Disputes did arise almost immediately. Pursuant to the wage scale set out in the collective-bargaining agreement, on November 2, 1984, Epic reduced its employees' wages from $17.50 per hour to $15.25 per hour and eliminated certain per diem payments. Criddle Affidavit, at 5. A total of 34 workers opposed this action and, by memorandum dated November 5, 1984, Epic acknowledged that those individuals were working under protest. Plaintiffs' Complaint, Exhibit B. Their protest remained one in name only, however, for on the same day Georgia Power canceled its contract with Epic. Epic immediately laid off its entire force of electricians at the Hatch Plant, including plaintiffs. Criddle Affidavit, at 5.

None of the employees whose pay was cut and who were subsequently laid off attempted to initiate grievance proceedings under the collective-bargaining agreement. Criddle Affidavit, at 6–7. On January 7, 1985, plaintiffs O'Neil and Kimmons filed their complaint with the Appling County Superior Court, seeking damages on behalf of themselves and others similarly situated for breach of contract, restraint of trade and fraud. Predicating jurisdiction on diversity of citizenship and § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1982), Epic timely filed a removal petition with this Court and now seeks to have the complaint dismissed on a motion for summary judgment.

The sole issue for resolution is whether plaintiffs have failed to exhaust their contractual grievance procedures mandated under the collective-bargaining agreement to which they were bound.

## DISCUSSION

■ As a general rule, employees claiming breach of a collective-bargaining agreement are bound by the terms of that agreement and must attempt to use the grievance procedures set out therein as their first mode of redress. *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). When employees asserting an arbitrable grievance have failed to use the dispute resolution machinery available to them under the agreement, their independent suit against the employer must be dismissed. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

Like most rules of law, these principles are easier to announce than they are to apply. In this case, for example, the chief difficulty lies in the fact that plaintiffs have not claimed breach of a collective-bargaining agreement. Instead they rely on *individual* written employment contracts, which specify wages and duration of the job but make no mention of a union contract. The restraint of trade charge likewise depends on Epic's unilateral alteration of terms contained in the letters of employment. Only in the fraud charge do the plaintiffs mention the role of IBEW in this sad saga. That charge alleges Epic falsely represented that the IBEW Local No. 508 had approved plaintiffs' employment at the Hatch Plant when in fact it had not. As a result of accepting jobs with Epic, plaintiffs claim they were charged with violations of their union constitution, were tried before a union tribunal and were fined.

When a worker arguably bound by a collective-bargaining agreement asserts an individual employment contract as the basis for a lawsuit, issues going to the heart of national labor policy arise, for the strength of our labor policy lies in its emphasis on collective efforts rather than individual action. The United States Supreme Court recognized this fundamental conflict in *J.I. Case Co. v. NLRB*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), when it held that to the extent that an individual contract and a collective agreement are inconsistent, the latter must prevail. *Id.* at 337–39, 64 S.Ct. at 580–81, 88 L.Ed. 767–68. Any individual contract by which an employer would "incidentally exact or obtain any diminution of his own obligation or any increase of those of employees in matters covered by the collective agreement" is inconsistent with the latter agreement. *Id.* at 339, 64 S.Ct. at 581, 88 L.Ed. at 768.

The Court expressly declined to hold that an individual contract more advantageous than the collective agreement was unenforceable *per se*, but Justice Jackson voiced disapproval of such contracts:

> The practice and philosophy of collective bargaining looks with suspicion on such individual advantages.... [A]dvantages to individuals may prove as disruptive of industrial peace as disadvantages. They are a fruitful way of interfering with organization and choice of representatives; increased compensation, if individually deserved, is often earned at the cost of breaking down some other standard though to be for the welfare of the group, and always creates the suspicion of being paid at the long-range expense of the group as a whole.

*Id.* at 338–39, 64 S.Ct. at 580–81, 88 L.Ed. at 768 (emphasis added). Justice Jackson further stressed: "Individual contracts ... may not be availed of to defeat or delay the procedures prescribed by the National Labor Relations Act ... or to limit or condition the terms of the collective agreement." *Id.* at 337, 64 S.Ct. at 580, 88 L.Ed. at 767.

The rationale underlying *J.I. Case* remains as valid today as it was 40 years ago. In fact, both the Fifth and Eleventh Circuit Courts of Appeal have followed similar lines of reasoning in rejecting employee claims based on individual contracts when it was apparent that the claims derived from rights under a collective-bargaining agreement. *See, e.g., Redmond v. Dresser Industries, Inc.*, 734 F.2d 633 (11th Cir. 1984); *Eitmann v. New Orleans Public Service, Inc.*, 730 F.2d 359 (5th Cir.1984). In *Redmond*, plaintiff tried to claim both an individual employment contract based on oral representations made by his superiors and an employment contract under the collective agreement. In *Eitmann*, plaintiff claimed that he, unlike other employees covered by the collective agreement, could not be discharged for inability to perform his duties if he was injured on the job. Plaintiff based his claim of "lifetime" employment on oral representations made by a manager. In both cases, the courts granted summary judgment for the defendant employers because the plaintiffs had failed to exhaust contractual grievance procedures mandated by an existing collective-bargaining agreement. *Redmond v. Dresser Industries, Inc., supra*, at 635; *Eitmann v. New Orleans Public Service, Inc., supra*, at 363.

■ To the extent plaintiffs here raise claims cognizable under the collective agreement between Epic and Local No. 508, this Court must likewise follow the lead of *Redmond* and *Eitmann* in granting Epic summary judgment, for it is undisputed that plaintiffs never availed themselves of the contractual grievance procedures. Plaintiffs' breach of contract and restraint of trade claims derive from Epic's unilateral decision to cut the pay and, subsequently, to terminate the employment of its electricians at the Hatch Plant. IBEW Local No. 508 was the exclusive representative of all employees in the Hatch Plant bargaining unit with respect to "rates of pay, wages, hours of employment and other conditions of employment." *See* Inside Working Agreement, § 2.05.

■ Wage reductions and layoff decisions clearly fall within the ambit of the

collective agreement and indeed are standard grist for the arbitral mill. Thus, before filing suit against their former employer, plaintiffs are obligated initially to pursue their claims through the contractual grievance machinery. *Hines v. Anchor Motor Freight, Inc., supra,* 424 U.S. at 563, 96 S.Ct. at 1055, 47 L.Ed.2d at 241; *Vaca v. Sipes, supra,* 386 U.S. at 184–85, 87 S.Ct. at 913–14; 17 L.Ed.2d at 854. Dismissal of the separate suit against the employer is the price of failing to grieve an arbitrable dispute. *Republic Steel Corp. v. Maddox, supra,* 379 U.S. at 652, 85 S.Ct. at 616, 13 L.Ed.2d at 583.

The Fifth and Eleventh Circuits have also held that such arguably extrinsic claims as fraud and misrepresentation can be subject to a contractual duty to grieve where the arbitration clause is broad and the claims relate generally to the employment relationship. *See, e.g., Mason v. Continental Group, Inc.,* 763 F.2d 1219 (11th Cir.1985) (misrepresentations about a plant closing); *Reese v. Mead Corp.,* 79 Lab.Cas. (CCH) ¶ 11,732 (N.D.Ala.1975), *aff'd mem.,* 529 F.2d 1350 (5th Cir.1976) (misrepresentations about availability of continued layoff rather than termination with severance pay).

The sweeping arbitration provisions of the instant collective-bargaining agreement purport to cover "[a]ll grievances or questions in dispute" without exception. *See* Inside Working Agreement, § 1.06. Plaintiffs' fraud claims address whether Local No. 508 had approved their employment at the Hatch Plant, as Epic represented, and thus relate to "other conditions of employment" for which Local No. 508 was the exclusive representative. *Id.* at § 2.05. Since union approval of plaintiffs' assignment to the Hatch Plant bargaining unit was a "condition of employment" within the scope of the collective agreement, Epic's alleged misrepresentations and the effect thereof were argubly arbitrable as "questions in dispute."

Unless one can say with positive assurance that the arbitration clause is not susceptible of an interpretation encompassing a particular dispute, doubts should be resolved in favor of coverage. *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The Court finds no difficulty in concluding that the fraud claims here are arbitrable, given that they implicate the union's right to be the exclusive representative for electricians working at the Hatch Plant. One cannot gainsay the union's interest in exerting some control, albeit limited, over the composition of the bargaining unit. Moreover, "it would seem entirely inappropriate to conclude that employees could cast aside the contract grievance procedure by merely alleging that statements made by the employer amounted to fraud." *Reese v. Mead Corp.,* 79 Lab.Cas. (CCH) ¶ 11,732, at 22,-005. Under the rubric of *Mason* and *Reese,* therefore, plaintiffs were bound to submit their arguably extrinsic fraud claims to the grievance process.

## CONCLUSION

Because plaintiffs have stated claims cognizable under the collective-bargaining agreement between Epic and IBEW Local No. 508, yet failed first to exhaust the contractual grievance procedures mandated by the agreement, defendant's motion for summary judgment is hereby GRANTED. The Clerk is directed to enter an appropriate judgment.

In light of the foregoing ruling, defendant's motion to deny class certification is DISMISSED AS MOOT.